JUDGE MARRERO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAULINE WEINSTEIN,

Plaintiff,

- against -

JAMES JEANS and JAMES CHUNG,

Defendants.

09 CV 5458

Index No.

**COMPLAINT**
**JURY TRIAL DEMANDED**

RECEIVED JUN 12 2009 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff, Pauline Weinstein by her attorneys, Liddle & Robinson, L.L.P., for her Complaint alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for damages and remedies for discrimination against Ms. Weinstein based on her sex, brought under: (1) the New York State Human Rights Law and (2) the New York City Human Rights Law.

## THE PARTIES

2. Ms. Weinstein resides at 455 FDR Drive, Apt. B1404, New York, New York 10002. She was employed by James Jeans and Mr. Chung from August 2007 through May 10, 2009, when her employment was terminated. At all times, Ms. Weinstein worked in New York, New York.

3. James Jeans is a company that makes and sells denim products and is located at 1545 Rio Vista Avenue, Los Angeles California 90023.

4. Mr. Chung is the owner of James Jeans and the primary decision maker of all employment decisions at James Jeans, including the issues raised in this Complaint. He resides at 2819 Coldwater Canyon Drive, Beverly Hills, CA 90210.

**JURISDICTION**

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1332 (Diversity Jurisdiction) and1367. The parties are citizens of different states and the amount in dispute exceeds $75,000.

**VENUE**

6. Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to Plaintiff's claims occurred within the Southern District of New York.

**FACTS**

7. Ms. Weinstein began working at James Jeans in August 2007 in the position of Brand Ambassador. She was located in the New York City office. Her primary responsibilities in this position were selling and promoting James Jeans. Among other things, she trained sales people who worked at department stores about the brand and sold the brand directly to smaller specialty stores. Mr. Chung referred to Ms. Weinstein as the "face of the brand."

8. At all times, Ms. Weinstein reported to Mr. Chung, who owns and operates James Jeans. Mr. Chung made all employment decisions, including the decisions to hire, promote, and terminate Ms. Weinstein.

9. Ms. Weinstein's performance was stellar, and, prior to her becoming pregnant, Mr. Chung told her she was "integral and valuable to our company." In fact, prior to terminating her employment, no one at James Jeans ever said anything negative about Ms. Weinstein's performance.

10. On September 22, 2008, Mr. Chung sent an email to Ms. Weinstein that praised her performance. Among other things, he wrote: "as we know you have become integral and valuable to our company. you have demonstrated innumerably over the course of the year that you are someone we can count on and someone who has exceeded and will continue to exceed beyond our expectations."

11. In this email, Mr. Chung also informed Ms. Weinstein that he had decided to promote her to Brand Manager, raise her base salary, and pay her more commission on her sales.

12. In December 2008, Lindsey Lieckfelt, one of the sales people in James Jeans' New York City office, left James Jeans. As a result, Ms. Weinstein was given additional accounts to cover. From the point forward, Ms. Weinstein covered the major department stores and specialty stores in 16 states.

13. In addition to her regular duties, Ms. Weinstein also contributed substantially to James Jeans by coming up with a new brand concept that Mr. Chung believes will "resurrect" the company. In January 2009, Ms. Weinstein met with Mr. Chung in Los Angeles, California. At this meeting, Ms. Weinstein pitched Mr. Chung with the idea for a new concept for James Jeans, called ICON Jeans. At this meeting, Ms. Weinstein laid out a marketing campaign and brand image for ICON Jeans. Specifically, Ms. Weinstein came with a slogan, "Icon … Live Vicariously." She also suggested launching ICON Jeans by collaborating with a young, hip celebrity, possibly Blake Lively. Ms. Weinstein's idea for ICON Jeans was "the pin up girl meets the hippie and turns it into something all her own." Mr. Chung indicated in a January 16, 2009 email that he was excited about this idea and wanted to pursue it.

14. In early March 2009, Ms. Weinstein reported to Mr. Chung that Barneys, the largest account she covered, "loved the fall collection," and intended to place a large order. Mr. Chung was very pleased with Ms. Weinstein's performance on this account.

15. In or around March 10, 2009, Ms. Weinstein attended a trade show in Dallas, Texas. At shows such as this, Ms. Weinstein's job was to sell James Jeans to specialty stores. Based on previous years' results, James Jeans expected to have sales of approximately $10,000 at this show. Ms. Weinstein's sales at that show were approximately $50,000. Mr. Chung complemented Ms. Weinstein on her performance at the Dallas show.

16. On March 31, 2009, Ms. Weinstein told Mr. Chung that she was pregnant. Ms. Weinstein communicated this news via an email, which read as follows: "I wanted to fill you both in on some very exciting news for me and Alan – Alan and I are having a baby!!! I am due late this September – and I plan on working up until I give birth. Also, I just want to let you know that I plan on coming back to work after a maternity leave. Of course, I still have a long way to go – but I wanted to let you know and hopefully we can discuss the logistics in next coming months."

17. The first week in April 2009, Ms. Weinstein was traveling on the road in Connecticut. Ms. Weinstein generated approximately $12,000 in sales on the road.

18. While Ms. Weinstein was on this road show – less than one week after she told her employer she was pregnant – James Jeans cut off her corporate credit card. On April 9, Ms. Weinstein reported this problem to Mr. Chung.

19. In the second week of April, Ms. Weinstein went on to the road Pennsylvania and New Jersey. Ms. Weinstein generated approximately $25,000 in sales on the road.

20. On April 16, 2009, Ms. Weinstein sent Mr. Chung an email reporting on the successes at the road shows. Ms. Weinstein sold approximately $12,000 worth of merchandise in Connecticut and approximately $25,000 in New Jersey and Pennsylvania.

21. On Sunday, May 10, 2009 at 8:13 PM, Mr. Chung sent an email to Ms. Weinstein that was addressed to Hallie Cahan, one of Ms. Weinstein's co-workers who worked in the Los Angeles office, informing her that he had decided to terminate her employment. Mr. Chung wrote: "With heavy heart, I have bad news to share. James Jeans will undergo a complete sales reorganization. In the best interest of the brand, it is time that we try something new and give others a chance to raise the brand to its rightful place. James Jeans can be a top brand and I need all the right help to get there and I am truly sorry that our journey together ends here. In some ways, fulfilling a brand's manifest destiny is a multiparty relay. We had you to bring along the brand to this point. Thank you so much. Now we have new members in the relay team to rally the brand to the next waypoint. No business decisions regarding employment are easy. It personally pained me to come to this decision. I am very much appreciative of your effort and dedication to the company. We wish you the best of luck in all your future endeavors. I am sorry but we have to turn over new leaves."

22. Ms. Weinstein did not know if she had been fired because the email was addressed to Ms. Cahan. This caused Ms. Weinstein, who was pregnant at the time, unnecessary and extreme stress and anxiety.

23. At 9:24 PM on May 10, 2009, Ms. Weinstein sent an email to Mr. Chung asking him to call her immediately to clarify his email.

24. At 9:55 PM, Mr. Chung responded. He explained that the email should have been addressed to Ms. Weinstein, and that "[i]t was really hard to make this decision but we feel that it is a necessary step towards rebuilding the branding during the darkest time."

25. On May 11, 2009, Mr. Chung sent Ms. Weinstein a follow up email that purported to set forth his reasons for the decision to terminate her employment. This email evidenced that James Jeans' proffered reason for terminating Ms. Weinstein was a pretext for discrimination. In fact, Mr. Chung admitted that "in a few months, I may be begging for your return."

26. Mr. Chung admitted that Ms. Weinstein was "dearly like[d] and will [b]e dearly miss[ed]." He also wrote that, "It is a veritable fact that you are a wonderful wonderful person. You have an uncanny knack for connecting with people and you are empathic and you genuinely have a kind heart."

27. Mr. Chung wrote that he decided to terminate Ms. Weinstein, in part, "due to the state of the economy." However, almost immediately after Ms. Weinstein was terminated, James Jeans hired two new sales associates for the company, one of which included a sales manager. She performed many of the same duties as Ms. Weinstein and was paid a similar amount. Thus, Mr. Chung's claim that he fired Ms. Weinstein because of the economy was a pretext.

28. In addition, in his May 11 email, Mr. Chung identified certain "shortcomings" of Ms. Weinstein. These alleged shortcomings are a pretext. For instance, Mr. Chung actually criticized Ms. Weinstein for failing to submit "a single brand input email" since January 2009. Yet, he admits that Ms. Weinstein's idea for ICON Jeans "is now the driver which will also in part resurrect the james business." Accordingly, Ms. Weinstein is being told,

on the one hand, her idea will resurrect the entire company, and, on the other hand, her failure to submit more ideas is one of the reasons for her termination. Mr. James also cited to a lack of "intel gathering and path finding." However, Ms. Weinstein performed these functions, which were not her primary duties, as well as anyone else. For instance, Ms. Weinstein sent so-called "intel" emails to Mr. Chung on March 19, 2009 and May 8, 2009. Incomprehensibly, Mr. Chung also blamed Ms. Weinstein for the loss of sales to the major department stores, while at the same time admitting that "we may have burned some of the bridges before your tenure ...." Ms. Weinstein, however, actually opened two new department store accounts: Anthropologie and Saks Fifth Avenue. Also, in March 2009, Bloomingdales indicated it wanted to resume buying from James Jeans, which resulted from Ms. Weinstein's efforts. Mr. Chung also failed to note that as of December 2008, Ms. Weinstein's responsibilities shifted to specialty stores, which included substantial travel, and Ms. Weinstein had excellent results in this arena.

29. Most telling, Mr. James admitted that after Ms. Weinstein's pregnancy and the period where she would have been on maternity leave, he might rehire her. He wrote: "in few months, I may be begging for your return."

30. Within days after Mr. Chung terminated Ms. Weinstein's employment, James Jeans added promotional material for ICON Jeans to its website. Included in this promotional material was the brand concept that Ms. Weinstein created.

31. Mr. Chung selected Ms. Weinstein for termination rather than Randy Klein, who also sold James Jeans out of the New York City office. Ms. Weinstein's performance was better than Ms. Klein's.

**FIRST CLAIM**

(Gender Discrimination Under the New York State Human Rights Law)

32. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 31, as if separately set forth herein.

33. At all relevant times, Plaintiff was an "employee" for purposes of § 296 of the New York State Human Rights Law.

34. Defendants are "employers" for purposes of § 292 of the New York State Human Rights Law.

35. By its actions detailed above, Defendant has unlawfully discriminated against Plaintiff on the basis of her sex in violation of § 296 of the New York State Human Rights Law. Defendants' actions include but are not limited to terminating Ms. Weinstein's employment without any basis within weeks of learning that she was pregnant.

36. As a result of Defendants' discrimination, Plaintiff has suffered substantial damages, including but not limited to lost wages and benefits, in an amount to be determined at trial.

## SECOND CLAIM
(Gender Discrimination in Violation of the New York City Human Rights Law)

37. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 36, as if separately set forth herein.

38. Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

39. Defendants are "employers" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

40. By its actions set forth above, Defendants unlawfully discriminated against Ms. Weinstein on the basis of her gender in violation of the New York City Human

Rights Law. Defendants' actions include but are not limited to terminating Ms. Weinstein's employment without any basis within weeks of learning that she was pregnant.

41. As a result of Defendants' discrimination, Plaintiff has suffered substantial damages, including but not limited to lost wages and benefits, in an amount to be determined at trial.

42. Defendants' discriminatory conduct was taken with reckless indifference to Plaintiff's rights, entitling her to punitive damages under the New York City Human Rights Law.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A. On the FIRST CLAIM, back pay and benefits and front pay and benefits, attorneys' fees, costs and interest, all in amounts to be determined at trial;

B. On the SECOND CLAIM, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, attorneys' fees, costs and interest, all in amounts to be determined at trial; and

C. Such other and further relief as the Court deems appropriate under the circumstances.

Dated: New York, New York
June 12, 2009

LIDDLE & ROBINSON, L.L.P.

By: ______________________
David Marek (DM 2083)
Attorneys for Plaintiff
800 Third Avenue
New York, New York 10022
(212) 687-8500